IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs September 27, 2022

## STATE OF TENNESSEE v. ADAM HOLMES

**Appeal from the Criminal Court for Knox County**
**No. 111616     Steven W. Sword, Judge**

_____

### No. E2021-01489-CCA-R3-CD

_____

The defendant, Adam Holmes, appeals his Knox County Criminal Court jury convictions of possession of a weapon by a convicted felon, second degree murder, and especially aggravated robbery, arguing that the trial court erred by admitting into evidence a Cellebrite cellular telephone data extraction report and the prior testimony of a State witness and by permitting a State witness to testify remotely. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and TOM GREENHOLTZ, JJ., joined.

Susan E. Shipley, Knoxville, Tennessee for the appellant, Adam Holmes.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald and Larry Dillon, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant by presentment with four alternative counts of unlawful possession of a firearm, three alternative counts of first degree felony murder, one count of first degree premeditated murder, two alternative counts of especially aggravated robbery, and five counts of criminal gang enhancement

related to the death of the victim, Daryl Singleton.[1]

At the October 2020 bifurcated trial, the defendant stipulated to his having a prior felony conviction that prohibited him from possessing a firearm.[2]

Michael Mays, the records custodian for the Knox County Emergency Communications 9-1-1 center, testified that a computer-aided dispatch report indicated that a 9-1-1 call was placed on June 8, 2017 at 1:07 p.m., regarding "a shooting on Westcott Avenue." The caller identified the location of the shooting as "the Western Heights Baptist Center." The report indicated that an ambulance was dispatched to the scene and "staged in the area until law enforcement got there." The jury listened to an audio recording of the 9-1-1 call.

During cross-examination, Mr. Mays testified that the CAD report indicated that "a suspicious black Ford Taurus" was seen leaving the scene with "[t]wo black males," "[o]ne with a backpack," driving "on Oldham towards Elm" and that the vehicle "turned off before Elm."

Knoxville Police Department ("KPD") Lieutenant James Burrell, a patrol supervisor, testified that on June 8, 2017, he was working "secondary employment" with KCDC, "the management of the developments where Western Heights is." He said that in this second job, he maintained "full police powers," wore his KPD uniform, and drove a patrol car. He explained that his patrol car had a video recording system that "automatically activate[d]" when he turned on the emergency lights and that he wore a "body mic" that captured audio recording "in conjunction with the video" from the vehicle. On June 8, 2017, Lieutenant Burrell responded to a call of a shooting "in front of the Baptist Center." As soon as he "pulled up onto the street," he was "getting flagged down. And there was a car in the middle of the street with a car door open. When I got out, I went in and I seen a young man inside." He checked but did not find a pulse on the victim. He asked bystanders "what had happened, if they'd seen anything or anything like that." He also called dispatch "to get first responders and EMS up there pretty quick, 'cause I wasn't getting a pulse." An EMS worker told Lieutenant Burrell that "they had seen somebody running at some point in time and maybe getting into a car." The jury viewed the video recording taken from Lieutenant Burrell's patrol car.

---

[1] Co-Defendant Kenneth Cox was also charged in the first degree murder and especially aggravated robbery counts of the presentment. The trial court severed the defendant's trial from Mr. Cox's, and Mr. Cox's trial was held first.

[2] Whether the prior felony conviction involved the use of violence, use of force, or use of a deadly weapon as charged in Counts 1, 2, 3, and 4 was considered by the jury in the bifurcated trial after they rendered verdicts in Counts 1, 5, 6, 7, 8, 9, and 10.

Shawn O'Brien worked for AMR ambulance service at the time of the shooting. He and his partner responded to the shooting, and "when we got to Western Heights, we staged to wait for the police department to clear the scene." He explained that staging meant that they were in "a standby mode, maybe a block or so away. And we just wait for the police department to clear the scene so we can go in." He staged the ambulance "between McSpadden [Street] and Reed, on Oldham [Avenue]. Maybe 100 meters from McSpadden." While parked and waiting on the police, Mr. O'Brien saw "one car that came around us and stopped by about 50 meters in front of us, and then two black males came down the hill, which would be, I guess, to the south side there and -- not running, but walking pretty hastily, which caught my attention. One of them had a backpack." He saw the two men go "to where this car was. And they both got in, like, either side." He said that the two men caught his attention because "how quick they were walking down the hill. It wasn't a normal pace. They're obviously in a hurry, not running, but in a hurry. Once they got in the car, . . . the car went pretty quick."

During cross-examination, Mr. O'Brien acknowledged that the Baptist Center on Scott Street is not visible from Oldham Avenue because of the terrain. He also acknowledged that Oldham Avenue is a "prime thoroughfare to get to [Interstate] 275" and that many black people lived in Western Heights.

Laketa Howard testified that she knew the victim by the nickname "Cleveland." She said that she had rented a car because her vehicle was being painted. She said that the victim and "Colbie Curry" came to her house on the day that Ms. Howard "was going to take the [rental] car back," but "Colbie asked me could he keep the car. And I was, like, yeah." She denied that she allowed the victim to drive the rental car, saying, "I didn't know he had the car." She said that it was her understanding that only Mr. Curry would be driving the rental car. She said that Mr. Curry is the defendant's nephew. She did not know that the victim was driving her rental car until "[t]he day that he got killed."

During cross-examination, Ms. Howard said that she rented a Hyundai Elantra from the Hertz on Clinton Highway. She reiterated that she never gave permission for the victim to be using or riding in the car.

Kristin Brown testified that she and the defendant have a son together. She said that she was in nursing school at the time of the shooting and was also working as a hair stylist. She said that in June 2017, she had "heard of" co-defendant Kenneth Cox, whom she knew as "Bosten." She said that the defendant's mother lived in Western Heights and acknowledged that she had "probably" given the defendant a ride to the neighborhood the day of the shooting in her black Mazda. She explained that she and the defendant would "wash clothes out there at his mother's, and he helped his mother out a lot." She recalled that she "dropped him off and I think I ran to the Dollar Store or

something." She said that she returned later to pick him up and found the defendant walking, not running, with Mr. Cox, and the defendant and Mr. Cox got in her vehicle. She did not specifically remember seeing an ambulance, noting that it was common to see ambulances in that area. Ms. Brown said that she spoke with the police about the incident on June 8, 2017. She said that she also gave a statement to police on May 8, 2018, and that she testified at Mr. Cox's trial in April 2019.

During cross-examination, Ms. Brown said that when the defendant and Mr. Cox got into her car, neither of them had a backpack or any other bag and neither was holding anything in their hands. She also said that neither of them had blood on their clothing.

Vanessa Clemons testified[3] that on June 8, 2017, she was volunteering at the Baptist Center in Western Heights. When asked whether she remembered hearing gunshots that day, she said, "My memory is so bad, I don't remember that." She also said that she was on medication and could not remember the events of that day. She responded to nearly every question by saying that she could not remember. She reiterated that she had a "condition" that "does not allow me to remember."

During cross-examination, Ms. Clemons said that she remembered working at the Baptist Center in June 2017. She again responded to nearly every question by saying that she did not remember.

Rachel Warren, a crime scene technician with KPD, testified that she responded to the shooting on June 8, 2017, and photographed the scene. She said that it was her usual practice to "never touch anything until the representative from the medical examiner's office gets there and takes their photos." She said that she took her "initial photographs" but did not touch anything. She determined that the victim had an "apparent gunshot wound" to "the right side of his head." She noticed "some cash inside that door pocket," which was later determined to be $6,000. Officer Warren took additional photographs after the medical examiner arrived. She also collected fingerprints from the vehicle. Her partner, Stephanie Housewright, swabbed areas of the vehicle "for possible touch DNA."

Officer Warren photographed three shell casings that were found "to the right rear of the vehicle," which shells officers later determined "had been run over," and they "were kind of weary of them actually being involved in this crime scene." Another shell casing was found "in front of [a] blue Acura." She said that she collected all of the shell casings from the scene and noted that several of the shell casings were .40 caliber and at

_____

[3]    Ms. Clemons testified via two way video-conferencing due to a postitive COVID-19 diagnosis.

least one was stamped with "Federal .40 caliber." After the vehicle was towed away, officers found a shell casing that had been underneath the vehicle, which shell casing Officer Warren described as "perfectly intact" and not bent.

Inside the vehicle, Officer Warren found a cellular telephone under a hat and Hertz rental car paperwork in the glovebox that showed the vehicle had been rented to Laketa O'Neil. In the middle console of the vehicle, Officer Warren found $18 cash and a wallet. She found a blue "folder" in the visor of the vehicle that contained a certificate of title "to some kind of Chevrolet vehicle" that "had been issued to Adam Holmes" with an address of 2335 Jefferson Avenue. The back of the title indicated that the defendant had sold the vehicle to the victim on June 6, 2017. After the medical examiner processed the victim's body, Officer Warren collected the victim's clothing and anything of evidentiary value collected from the victim, including a "DNA card" and "the bullet that was retrieved from the victim's head."

During cross-examination, Officer Warren testified that she recovered two cellular telephones from the vehicle and "some memory devices" from the glovebox. She said that the shell casings found behind the vehicle did not appear to have been fired recently because they appeared to have been run over. She said that the shell casing found under the vehicle was a 9-millimeter caliber. She said that she "would assume that someone had just accidentally kicked that [shell casing] underneath the car" but acknowledged that she did not see anyone do so.

KPD crime scene technician Stephanie Housewright testified that she assisted Officer Warren in processing the scene of the victim's shooting. She said that she "took swabs of the vehicle" for DNA testing.

Terra Asbury, a special agent forensic scientist for the Tennessee Bureau of Investigation ("TBI"), testified that she performed DNA testing on several swabs taken off the vehicle. She also received buccal swabs from the defendant and Mr. Cox for comparison. She determined that a swab taken "from the exterior front passenger door handle" of the vehicle contained the DNA of the victim. All other swabs contained DNA, the profile for which was inconclusive. She explained that for some DNA samples, the profiles "were inconclusive" because the samples were "insufficient or had too complex a mixture for me to be able to determine a DNA profile," while other samples "were from an unknown male individual," which profile "did not match any of the standards that I had received." During cross-examination, Agent Asbury said that none of the DNA samples that were from an unknown male matched the DNA profiles of the defendant or Mr. Cox.

Tim Schade, who worked as a certified latent print examiner with KPD at the time of the shooting, testified that he processed 14 fingerprint cards collected from the

crime scene, 12 of which "were good enough to be identified." A left palm print "taken from the exterior above the front passenger door" matched a Willie Lester Robinson. A left palm print taken from "the exterior rear passenger door" matched a Jasmine Latrice Hollingsworth. A right middle finger print taken "from the exterior rear driver door," a left middle finger print taken from "the exterior front driver door," a right middle finger print taken from the "exterior rear driver door," and a left palm print taken "from the exterior front driver's door" matched the victim. During cross-examination, Mr. Schade testified that none of the prints that he examined belonged to the defendant or Mr. Cox.

KPD Violent Crimes Investigator Jeff Day testified that he was the lead investigator in this case. When he arrived at the scene, he saw that the driver's door to the victim's vehicle "was opened" and the "victim was in the driver's seat." He went to "the other side of the Baptist Center" where "there was a bit of a crowd gathering" and "talked to some people" and "got some information prior to coming back up to the scene." Investigator Day said that he was present when Investigator Brandon Wardlaw began interviewing Ms. Clemons inside the Baptist Center, but Investigator Day "didn't stay there for the entire interview." An audio recording of Ms. Clemons' interview was exhibited to the investigator's testimony. Investigator Day said that Ms. Clemons gave a "fairly detailed" account of the events and that it "appeared to [Investigator Wardlaw] . . . that she did, in fact, see what happened."

Investigator Day said that he met with Ms. Clemons on another occasion and showed her two photographic arrays and that Ms. Clemons identified the defendant as one of the men that she saw flee after the shooting. The next day, the defendant and Kristin Brown, whom the defendant referred to as his wife, were "brought to the Safety Building for an interview." Officers collected three cellular telephones from the defendant and the defendant's vehicle. Investigator Day said that he interviewed the defendant and Ms. Brown. The jury viewed the video recording of the defendant's entire interview. Investigator Day said that during the interview, the defendant told him that on the day of the shooting, he and the victim had met to finalize the sale of the Chevrolet vehicle. The defendant identified the victim as being in the driver's seat of the vehicle and the defendant as being in the front passenger's seat. Investigator Day said that the defendant told him that when he left the Baptist Center, the defendant's girlfriend picked him up on Oldham Avenue.

Investigator Day said that the data extracted from the defendant's cellular telephone "establishes the communication between [the defendant] and not only the victim, but another person who could have been in the car." In the defendant's telephone, he had two contacts identified as "Bosten" and "Debo," the victim was identified as "Hit," and Ms. Brown was identified as "Wife." Investigator Day determined Bosten to be Mr. Cox and Debo to be Dennis Freeney. Investigator Day reviewed a synopsis of the

-6-

defendant's call log, which showed a series of telephone calls between the defendant and Mr. Cox, Mr. Freeney, Ms. Brown, and the victim on June 8, 2017, between 10:57 a.m. and 1:13 p.m. From the data extraction report, Investigator Day determined that the defendant used his telephone to access Google on the evening of the shooting and "search for Knoxville news" and to access a local news article about a shooting in the Beaumont neighborhood. Other entries indicated that the defendant also looked at a "couple other entries about an East Knoxville [s]hooting." In the early morning of June 9, 2017, the defendant used his telephone to "search for Knoxville bonding companies."

Investigator Day said that he was present during Mr. Cox's trial and heard the testimonies of Ms. Clemons[4] and Ms. Brown. The trial court held a jury-out hearing and determined that a partial transcript of Ms. Brown's prior testimony and the entire transcript of Ms. Clemons' prior testimony at Mr. Cox's trial were admissible as substantive evidence, and the transcripts were exhibited to Investigator Day's testimony.

The transcript of Ms. Clemons' prior testimony indicated that on June 8, 2017, she was volunteering at the Baptist Center on Scott Street in Western Heights when she "heard a pop." She looked out the window of the building and "saw a black guy. He was leaned over in the car, where you could see . . . his brains laying out, whatever, from the bullet wounds." She also saw "a tall guy" who was standing "at the front of the car on the passenger side" and "a shorter guy that got out of the back[seat]" on the passenger's side of the victim's vehicle. She described the taller man as wearing a "headdress." Both men "took off running," "ran halfway down the walkway, stopped," and "the shorter guy came back, walked around, . . . opened the driver's side, opened the door, reached in, got a duffel bag and a gun, a big, silver gun." The shorter man "then went back to where the tall guy was standing in the middle of the walkway and handed him the gun and the duffel bag." She then saw the two men run in the direction of "Mike's" apartment, "a neighborhood safe house." When the police arrived and "asked if anybody seen anything," Ms. Clemons "kind of pulled 'em to the side and told 'em, you know, I didn't want to talk in front of everybody, but I wanted them to at least be knowledgeable to what was going on." During cross-examination by Mr. Cox's attorney, Ms. Clemons testified that she viewed a photographic array and "picked a person out of the lineup." She also said that she identified one of the men that she had seen as a tall guy with "[d]reads."

During cross-examination, Investigator Day said that when Ms. Clemons made an identification from a photographic array, he and Investigator Wardlaw were both present. Investigator Day acknowledged that the defendant was "[r]oughly" five feet and 10 inches tall and said that the defendant was "not shorter than average by no means" but that he did not consider the defendant to be tall. He estimated that Mr. Cox was "probably

---

[4] Ms. Clemons' name was Vanessa Teasley at Mr. Cox's trial.

five-seven or five-eight . . . . but he's not five ten." He said that "it appeared, based on the evidence, that whoever was in the passenger side" of the victim's vehicle "was the shooter" and that, during the defendant's interview, the defendant "placed himself in the passenger side." He acknowledged that the blood spatter on the front passenger seat was inconsistent with someone's "[b]eing seated in the front seat." He explained that the evidence indicated that the "angle of the shot came from that side" but that the shooter was "not necessarily seated in the seat." Investigator Day acknowledged that Josh Smith, a former KPD officer, took possession of the defendant's telephone to perform the data extraction and that Investigator Day "did not stand over him and watch" him perform the extraction. He acknowledged that Mr. Smith had been indicted for falsifying records at KPD.

Teri Arney, a former special agent with the TBI, testified as an expert in firearms identification. In this case, Ms. Arney "received a bullet jacket and bullet core from the victim's head," "a 9-millimeter caliber cartridge case," and "four of the .40-caliber cartridge cases." She determined that all four of the .40-caliber cartridge cases "had been fired by the same .40-caliber firearm" and that "[s]ome of the .40s had crushed case mouths" and "were crumpled, which could happen if they were stepped on or run over." The 9-millimeter cartridge case was "a Winchester brand" and "looked like I would expect something that had just been fired. It didn't have any other damage other than what the firearm did when it fired the cartridge case." She determined that the bullet jacket removed from the victim's head was "a 9-millimeter caliber. And based on the design and the material that it was made from, it's consistent with Winchester brand silver tip ammunition." She could not determine whether the bullet came from the 9-millimeter cartridge case recovered from the scene but said that it was consistent with "what I would expect to see loaded in that brand of cartridge case."

During cross-examination, Ms. Arney acknowledged that "there's no way to . . . match a fired bullet back to the cartridge case" without the firearm. She also acknowledged that she could not determine from the bullet or cartridge casing the make of firearm used. She acknowledged that a 9-millimeter firearm could not fire .40-caliber shells.

KPD Officer Shannon Morris testified that she worked in digital forensics and that she was "certified with Cellebrite, which is a cell phone forensic device." She said that she was not initially involved in this case and that only a couple of weeks before trial, Investigator Day asked her to examine the Cellebrite data extraction report from the defendant's telephone and "make sure that that extraction came from that phone." She explained that to perform data extraction, "you take your iPhone charger and plug it directly into our Cellebrite computer at the forensics lab. And it goes through and does what they call an advanced logical." She said that the only information that is input in the Cellebrite computer is "[j]ust the data, the ones and zeros that's stored in the phone." The Cellebrite

computer "provides what they call a physical analyzer, which is a forensic software that puts . . . all those one and zeros in human readable format." She said that it was not possible for an examiner to corrupt or influence the data in Cellebrite and that "the created dates" of data entries "are going to be the day that it was created on that device."

Officer Morris testified that she reviewed the extraction report of Mr. Smith and determined that he did not add anything to the report other than "his case notes . . . . That's the only thing that you can manipulate." On Mr. Smith's report, his case notes "just said J. Smith was the examiner" and "'iPhone SE.'" She concluded that the International Media Equipment Identity ("IMEI") on Mr. Smith's data extraction report matched the IMEI engraved on the defendant's telephone. Officer Morris said that the data extraction report indicated that on June 8, 2017, between 10:57 a.m. and 12:58 p.m., the defendant placed and received a series of telephone calls with Mr. Cox and the victim. The defendant also called Ms. Brown at 1:05 p.m., 1:06 p.m., and at 1:10 p.m., and received a call from Ms. Brown at 1:13 p.m. Officer Morris said that the data extraction report also showed the defendant's "Google web history," which indicated that beginning in the evening of June 8, 2017, the defendant accessed news articles titled, "Knoxville police: Man found shot to death in car in Beaumont neighborhood," "KPD investigating fatal shooting of male in vehicle," and "Police respond to reported shooting." In the afternoon and evening of June 9, 2017, the defendant searched for "knoxville bonding companies" and "federal lawyer Paula Knoxville tn" and accessed a web page titled, "Knoxville Lawyers - Find Your Knoxville, TN Attorney or Law Firm."

Dominique Bailey testified that she had known the victim for "[a]bout a year" before his death and that the two of them had been in a relationship. She identified a photograph of the victim wearing a cap and said that it was not a cap that he ordinarily wore but that she had seen the cap before. She said that on the morning of the shooting she had worked her job at "Jewelry Television." She said that she had two sons, ages 11 and six at the time, and that the victim had two sons close in age to hers. At the time of the shooting, the victim's sons "were on summer break, so they were at the house with my boys." She said that the victim planned "to leave out, and that he was going to go get the boys something to eat and then bring it back and they were going to do something till I got off of work." She was aware that the victim had purchased a "Caprice Classic, box Chevy" and "was trying to get the title transferred into his name, but he couldn't get the title transferred over because there was an issue with the lien or something on the title." She said that the victim purchased the vehicle from Mr. Curry, who "was kind of like a middleman for [the defendant]." She said that the victim was not employed and acknowledged that he sold drugs and owned a "black and silver" gun. The victim also "carried a backpack sometimes, and then he had a black pencil bag" in which he kept "[m]oney." She said that the victim had the backpack and pencil bag with him at her house that morning.

-9-

Ms. Bailey said that she knew the victim had two cellular telephones and that he was driving Ms. Howard's rental car. She said that the victim also "had a Toyota Solara, but he wasn't driving that car at the time. It was parked." The Chevrolet that he had purchased from the defendant "was at a storage facility on Western Avenue . . . . Just parked where he had his stuff at." She said that the Chevrolet was "drivable, . . . but he didn't drive it."

During cross-examination, Ms. Bailey acknowledged that she did not know all of the victim's business, saying, "I mean, I didn't get into his personal -- what he did in the streets . . . ." She said that when the victim left the house the day of the shooting, he was planning to deal with the issue on the title to the Chevrolet. She said that the victim was wearing a "stocking cap" under his hat the day of the shooting because "he had an appointment to get his hair done." She acknowledged that she did not see the victim leave her house that day.

Doctor William Oliver, an assistant medical examiner at the Regional Forensic Center in Knoxville, conducted the victim's autopsy and testified as an expert in forensic pathology. He determined that the victim's "cause of death was a gunshot wound to the head" and that the bullet entered the right side of the victim's head, "right to left, little bit upwards, little bit from front to back," causing "a significant amount of damage to the brain." He said that the range at which the victim was shot was "indeterminant" because "I can't say there's stippling present. There's certainly no soot present."

During cross-examination, Doctor Oliver testified that the caliber and length of the firearm were important to consider "if you want to make a numerical estimate of the range" from which a victim was shot. He also said that the type, milling, and "number of grains of powder in the cartridge" can also help determine the distance at which a victim was shot. He acknowledged that "you would not have any" powder or stippling at the wound if the person wore a head covering. Doctor Oliver said that the blood and tissue found on the victim's baseball cap were "consistent" with the victim's wearing the cap at the time he was shot.

On redirect examination, Doctor Oliver said that the victim's wound was "not a contact gunshot wound."

The State rested. After a *Momon* colloquy, the defendant elected not to testify but did put on proof.

Paulette Sutton testified as an expert in bloodstain pattern analysis and crime scene reconstruction. She testified that in this case, she reviewed crime scene photographs,

the victim's autopsy report, the medical examiner's photographs, and "inventory sheets" from the KPD. She testified that "the first responding officer . . . reported that he found the vehicle with the driver's door opened," the driver's window "partially opened," the rear driver's side window closed," the front passenger window closed, and the "the rear of the car . . . partially opened." She also testified that the victim "was initially reported as having his right arm in the passenger seat, his left arm in his lap," and "lean[ing] a little bit to his right, or towards the middle of the vehicle." She determined based on the bloodstain patterns "that the keys were not in the ignition at the time" the victim was shot. She also determined that the victim's arm had "been straightened out more than it was at the time the projected stains" from the gunshot "were created." Based on the "continuous pattern" of blood "all the way across . . . the console, across the [passenger's] seat and onto the lateral edge of the seatback," Ms. Sutton concluded that "[t]here's no indication that anybody was in that front seat at the time of the gunshot" or that "an individual or an object moved or was moved through that blood" "after the gunshot." She also concluded, based on "satellite spatters" of blood "that the front passenger door was closed at the time of the gunshot or very close in proximity to the time of the gunshot." Based on the blood pattern and "apparent brain tissue" on the cap, she said that the victim was either wearing the cap or it was lying in the passenger's seat at the time he was shot. She concluded that it was "certainly possible" and that she could not rule out the victim's having been shot by a person in the backseat of the vehicle.

Ms. Sutton also explained that the 9-millimeter cartridge casing would have fallen outside of the car if the shooter had been outside of the vehicle and that if the shooter were inside the vehicle, the cartridge casing could have gotten "caught in people's clothing. And as they exit the vehicle, they dump it out." She said that the fact that the 9-millimeter casing was found under the vehicle "[c]ertainly could be" consistent with the shooter's having been in the backseat of the vehicle.

During cross-examination, Ms. Sutton said that it appeared to her that the victim had been moved after he was shot, specifically, she said that his head and arm had been moved. She said that she believed that either the police or medical examiner moved the victim's body during their investigation. She also said that someone checking the victim's neck or wrist for a pulse could have moved the body. She said that based on bloodstain patterns on the front passenger's door of the vehicle, the door "ha[d] to be closed either at the time or very quickly" or "a couple of seconds" after the victim was shot. She agreed with Doctor Oliver's assessment that the victim was not shot at "contact range." She acknowledged that it was possible that the shooter was outside of the vehicle on the passenger's side when he fired the shot.

The defendant rested.

-11-

On this evidence, the jury found the defendant guilty of one count of unlawful possession of a weapon in Count 1, four counts of second degree murder in Counts 5 through 8, and two counts of especially aggravated robbery in Counts 9 and 10. The State dismissed Count 4.

The trial then continued as to Counts 1 through 3 for the jury to determine the nature of the defendant's prior felony conviction. Stephanie Ogle, the office supervisor for the Knox County Criminal Court Clerk, testified that on April 25, 2002, the defendant was convicted of aggravated robbery by "unlawfully, knowingly, [and] by violence" robbing Frank McCoy, accomplishing the robbery "with a deadly weapon." The State rested, and the defendant put on no proof. As to Count 1, the jury found that the defendant had a prior conviction for a felony involving the use of violence. The jury also found the defendant guilty as charged in Counts 2 and 3 with the unlawful possession of a firearm after having been convicted of a felony involving the use of force and a felony involving a deadly weapon.

The State dismissed Counts 11 through 15 related to the criminal gang enhancement.

After a sentencing hearing, the trial court merged the appropriate convictions and sentenced the defendant as a Range II offender to an effective sentence of 40 years' incarceration aligned consecutively to an 8-year sentence in a prior case. Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by admitting into evidence the Cellebrite data extraction report and Ms. Clemons' prior testimony and by permitting Ms. Clemons to testify via two-way video conferencing.

## I. Admission of Evidence

The defendant argues that the trial court erred by admitting the Cellebrite data extraction report and Ms. Clemons' prior testimony from Mr. Cox's trial.

### A. Cellebrite Data Extraction Report from the Defendant's Cellular Telephone

The defendant challenges the admission of the Cellebrite data extraction report from the defendant's cellular telephone, arguing that the State failed to establish the chain of custody of the physical cellular telephone from which the data was extracted and that the data extraction report was not properly authenticated. The State argues that the trial court did not abuse its discretion in admitting the report and, alternatively, that any error in admitting the report did not prejudice the defendant.

-12-

### 1. *Chain of Custody of the Defendant's Cellular Telephone*

The defendant contends that the State failed to establish the chain of custody of the defendant's telephone because Investigator Day gave the telephone to a KPD officer who was subsequently terminated from the KPD for activities involving "computer records" and "work time sheets." The State argues that Investigator Day's testimony sufficiently established the complete chain of custody of the telephone.

The trial court held a jury-out hearing on the chain of custody of the cellular telephones collected from the defendant. The trial court voir dired Investigator Day, who said that he saw the cellular telephone in the defendant's vehicle and instructed other officers to seize it. Officer Danielle Sandborn brought the telephone to Investigator Day in an "unmarked envelope" at the station, and then former officer Smith "came and got that phone off of my desk, I believe, and took it to his" desk, which was "in the same room," and "does the [data] dump and then puts it back on my desk." He said that the "phone never left the office." The cellular telephone that officers brought to him at the station "looked to be the same cell phone I saw in the console of the car."

The defendant cross-examined Investigator Day who acknowledged that he did not see Mr. Smith perform the data extraction, noting that it took place "across the room."

The trial court determined that Investigator Day's testimony established a sufficient chain of custody and that the physical telephone was admissible.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof." *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody," *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *id.* The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d

877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

In our view, the trial court did not abuse its discretion in determining that the chain of custody for the defendant's cellular telephone was sufficient. Investigator Day testified that he saw the telephone in the defendant's vehicle and that he instructed crime scene officers to collect the telephone into evidence. Officer Sandborn delivered the telephone to Investigator Day at his office in an "unmarked envelope," and Investigator Day determined that the telephone "looked to be the same cell phone I saw in the console of the car." Investigator Day gave the telephone to Mr. Smith to perform a data extraction, which Mr. Smith did without removing the telephone from the shared office and, after which Mr. Smith returned the telephone to Investigator Day. Consequently, the trial court did not err by finding that the State established a sufficient chain of custody for the defendant's cellular telephone or by admitting the telephone into evidence. *See State v. Brian C. Felix*, No. M2021-00388-CCA-R3-CD, 2018 WL 2722796 at *23-24 (Tenn. Crim. App., Nashville, June 6, 2018).

### 2. *Authentication of Cellebrite Data Extraction Report*

The defendant argues that the State failed to properly authenticate the Cellebrite data extraction report because it "did not call any witness from the Cellebrite Corporation" to authenticate the record and did not offer any business record or affidavit to "authenticate or substantiate the contents, nature, or methodology of the extraction." The defendant also complains that the State failed to give adequate notice of its intent to call Officer Morris as an expert witness, that the State failed to substantiate Officer Morris' credential of having been "'certified' by Cellebrite," and that Officer Morris "prepared no report of her forensic conclusions." The State argues that because the report was properly authenticated and because Officer Morris did not testify as an expert witness, the trial court properly admitted the report.

During a jury-out hearing, the State proffered the testimony of Shannon Morris to establish a foundation for the Cellebrite data. On direct examination, Officer Morris, a digital forensics analyst with the KPD, testified that she "do[es] the forensic extractions and examinations" of "[a]ny electronic evidence, computers, phones, tablets." She said that former KPD officer Josh Smith did the original extraction of data from the defendant's cellular telephone in this case. She explained that to extract data from an iPhone, "you plug them directly into your UFED Cellebrite device, which is the software used to extract it. It will pull the ones and zeros off the phone and put it into my forensic computer. And then the . . . Cellebrite software puts it in a human readable format." She said that once the data is "in a compressed zip file," "you can't manipulate it." She said

-14-

that an examiner can add a note, such as "UFED logical extraction, iPhone SE," as done in this case, "but there's no manipulating the ones and zeros" or the call log.

Officer Morris said that she reviewed the Cellebrite data extraction from the defendant's cellular telephone conducted by Mr. Smith and "matched it with the . . . International Media Equipment Identity" ("IMEI"), which "stays with the phone no matter who owns it; what device or what service goes with it, it stays the same. You cannot manipulate it." After checking the telephone's IMEI against Mr. Smith's extraction, Officer Morris "did my own extraction," and determined that "all the media, MMSs, notes, everything was the same number-wise of what was extracted." She said that based on her training and expertise, Mr. Smith's Cellebrite report is a fair and accurate representation of the data extracted from the defendant's telephone.

During cross-examination, Officer Morris testified that she began working on this case only "about two weeks" before trial. She acknowledged that she was not involved in the original data extraction performed by Mr. Smith.

The trial court found "sufficient evidence to find that the original report is authentic and sufficiently free from any manipulation" and admitted Mr. Smith's Cellebrite data extraction report into evidence.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, that court's ruling will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433 (Tenn. 2018); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Rule 901 provides in pertinent part as follows:

(b) Illustrations. — By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of Witness With Knowledge. —

Testimony that a matter is what it is claimed to be.

. . . .

(4) Distinctive Characteristics and the Like. — Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with other circumstances.

. . . .

(9) Process or System. — Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

Tenn. R. Evid. 901. As noted above, these examples of authentication are for "illustration only." Tenn. R. Evid. 901(b). "Subsection (b)(4) simply makes common sense. Without drawing the boundaries of practical possibilities, the rule allows proof to the court of a myriad of distinctive characteristics that may convince the judge that a questioned document is authentic enough to let the jury consider it." *Id.*, Advisory Comm'n Comments. The Advisory Commission Comments also provide that "[s]ubsection (b)(9) treats authentication of computer documents. All that the lawyer need do is introduce evidence satisfying the court that the computer system produces accurate information." *Id.*, Advisory Comm'n Comments.

In our view, the trial court did not abuse its discretion by finding that the State sufficiently authenticated Mr. Smith's Cellebrite data extraction report. Officer Morris' testimony established that the Cellebrite software produced a report that cannot be manipulated other than with the insertion of case notes and that the report generated by Mr. Smith was an accurate report of the data extracted from the defendant's cellular telephone. She confirmed that the IMEI on Mr. Smith's report matched that of the defendant's telephone and that Mr. Smith's report contained the same number of entries as the data extraction report that she produced from the defendant's cellular telephone.

*B. Ms. Clemons' Prior Testimony*

The defendant asserts that the trial court erred by admitting into evidence Ms. Clemons' prior testimony, arguing that its admission violated both Evidence Rule 803(26) and his right to confrontation because he did not have an opportunity to cross-examine Ms. Clemons at Mr. Cox's trial. The State argues that the trial court did not abuse its discretion in admitting the testimony because the defendant "had the opportunity to cross[-]examine

-16-

Ms. Clemons on her prior testimony during [the defendant's] trial."

During a jury-out hearing, the State asked Ms. Clemons whether she remembered testifying at Mr. Cox's trial, and she said that she did not. The State then asked Ms. Clemons whether she recalled being asked the following questions and making the following statements during her testimony at Mr. Cox's trial:

Q:      What did you see?

A:      When I went over there, I seen the black guy. He was leaned over in the car, where you could see, I guess, you would say, his -- actually, I'm trying to be nice about it -- his brains laying out, whatever, from the bullet wound.

. . . .

Q:      Did you see anyone get out of the car?

A:      Yes. I seen a tall guy. He was in the front. He was standing in front, and it was a shorter guy that got out of the back. They both took off running, and they stopped in midstream. And when they stopped, they sent the short -- the tall guy sent the short guy to go back to the car and come around on the driver's side, reach in, got a duffel bag and a gun.

. . . .

Q:      And where did they run to?

A:      They ran halfway down the walkway, stopped, and he sent -- I don't know if he sent, but the shorter guy came back, walked around, reached in the -- pull -- I mean, opened the driver's side, opened the door, reached in, got a duffel bag and a gun, a big, silver gun.

. . . .

Q:      Okay. And is Mike -- is Mike White Mike?

A:      Yeah, he's a neighborhood safe house.

-17-

. . . .

Q: Do you recognize Exhibit 78?

A: Yes.

Q: And what is Exhibit 78?

A: You're talking about right here?

Q: Yes, ma'am.

A: This photo is what I identified, right there. That was --

. . . .

A: . . . . This photo, photo number 3.

. . . .

Q: And the person you identified in Exhibit -- in photo number 3, where was this person at?

A: That's the one that was in the front.

Ms. Clemons said that she did not remember making any of the statements and denied that the transcript refreshed her recollection on the matter.

After Ms. Clemons' testimony, the State moved to introduce "parts of" Ms. Clemons' prior testimony from Mr. Cox's trial into evidence under Rule 803(26). The defendant objected to the admission of the portions of Ms. Clemons' prior testimony related to her identification of the defendant, arguing that "they weren't seeking to have her identify [the defendant] at Mr. Cox's trial" and that there was no "memorialization or tape of her purported identification of [the defendant] to the police." The defendant also objected to the admission of any of Ms. Clemons' prior testimony on the ground that the defendant "did not have counsel [at Mr. Cox's trial] conducting a cross-examination of this witness." The trial court found that Ms. Clemons' "denial of being able to remember anything is a prior inconsistent statement, under [Evidence Rule] 613(b)" and that her prior testimony was admissible for impeachment. The court also found that Ms. Clemons was a "reluctant witness" at Mr. Cox's trial but that "her memory was pretty good" and noted

that her prior trial testimony was consistent with the statement she gave to Detective Wardlaw. The court concluded that Ms. Clemons' "prior testimony was [made] under circumstances indicating that it was trustworthy" and admitted the entirety of her prior trial testimony as substantive evidence, explaining, "Ms. Clemons couldn't remember anything. So everything was inconsistent with what she was saying here today."

### 1. Evidence Rule 803(26)

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

In addition to the exceptions for admission in Rules 803 and 804, Evidence Rule 613 provides a potential avenue for the admission of an out-of-court statement. Under Rule 613, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b); *see State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (confirming that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement"). "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement" because "[t]he unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness during trial." *Martin*, 964 S.W.2d at 567. On the other hand, extrinsic

evidence of a prior inconsistent statement will be admissible when a witness denies making the statement, equivocates about having made the statement, or testifies that he or she does not recall making the prior inconsistent statement. *Id.* (citing *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996)).

Generally, because they contain hearsay, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 803(26), however, provides an exception to the hearsay rule permitting a prior inconsistent statement of a witness that is "otherwise admissible under Rule 613(b)" to be used as substantive evidence if the declarant testifies at trial; the statement is recorded, signed by the declarant, or given under oath; and "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26). The latter finding requires the trial court to "conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness." *Id.* The Advisory Commission Comments to Rule 803(26) provide that "[t]o be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613."

Here, Ms. Clemons testified that she did not remember making the specific statements that the State asked about from Mr. Cox's trial. Consequently, those portions of her prior testimony directly contradicting those statements were admissible as impeachment evidence under Rule 613(b). *See Kendricks*, 947 S.W.2d at 882 ("[T]his court has previously ruled that '[i]f the witness denies or does not recall making the statement, then it can be used to impeach the witness'[s] testimony.' [Evidence Rule] 613 does not change this holding." (second alteration in *Kendricks*) (citations omitted)). Additionally, because Ms. Clemons' prior statements were given under oath, because she testified and was subject to cross-examination at the defendant's trial, and because the trial court held a jury-out hearing and determined that Ms. Clemons' prior statements were made under circumstances indicating trustworthiness, the inconsistent statements were subject to admission as substantive evidence under the terms of Rule 803(26). The trial court erred, however, by admitting the entirety of Ms. Clemons' prior testimony into evidence instead of redacting the prior testimony to include only the five inconsistent statements the State asked her about. *See State v. Ackerman*, 397 S.W.3d 617, 638-39 (Tenn. Crim. App. 2012) ("Nothing in [Evidence Rule 613(b)] permits the admission of a witness's prior statement in its entirety. . . . If the victim's lack of memory was sufficient to establish inconsistency, then only those portions of the video directly related to a claimed lack of memory would have been admissible."), *overruled on other grounds by State v. Sanders*, 452 S.W.3d 300 (Tenn. 2014).

We conclude that the erroneously admitted portions of Ms. Clemons' prior testimony were harmless. *See State v. Martin*, 964 S.W.2d 564, 568 (Tenn. 1998) (A trial court's "violation of an evidentiary rule may not mandate reversal if the error 'was more probably than not harmless.'" (quoting *United States v. Barrett*, 703 F.2d 1076, 1081-82 (9th Cir. 1983) and citing *Wilson v. State*, 724 S.W.2d 766, 769 (Tenn. Crim. App. 1986)). The only statements in Ms. Clemons' prior testimony that related to the shooting was that she "heard a pop," that the taller man who was standing at the front of the victim's vehicle wore a "[h]eaddress," that the shorter man "got out from the back" passenger's side of the victim's vehicle, that the shorter man "reached over" the victim to retrieve the gun and duffel bag, that the shorter man gave the bag and gun to the taller man, that the two men ran in the direction of "where this guy Mike lived at," and that the person she identified from the photographic array had "[d]reads." The remainder of the erroneously-admitted prior testimony related to her volunteer activities at the Baptist Center, her giving a statement to police at the scene, and the fact that she did not identify Mr. Cox from a photographic array. None of these statements further implicated the defendant in the shooting, and the exclusion of these inadmissible statements would not likely have changed the jury's verdict.

### 2. Confrontation Clause

The defendant also asserts that the admission of Ms. Clemons' prior testimony violated his right to confrontation because he did not have an opportunity to cross-examine Ms. Clemons at Mr. Cox's trial.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007)). In *Crawford v. Washington*, the United States Supreme Court departed from decades-long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* Because the Confrontation Clause does not bar nontestimonial hearsay, *see Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), "the threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-

court statement is whether the challenged statement is testimonial." *Dotson*, 450 S.W.3d at 63 (citing *Cannon*, 254 S.W.3d at 301).

The *Crawford* court identified, for illustrative purposes, a "core class of 'testimonial' statements": "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52 (alteration in original) (citations omitted). Similarly, the court observed that some "statements . . . by their nature were not testimonial," including, among other things, "business records." *Id.*; *Dotson*, 450 S.W.3d at 64. The Supreme Court has also recognized that "medical reports created for treatment purposes . . . would not be testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *see also Cannon*, 254 S.W.3d at 303 (statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial). Thus, statements that are properly categorized as business records or medical records are nontestimonial, and the Confrontation Clause has no application to their admission into evidence. *Cannon*, 254 S.W.3d at 303.

For those statements that are not easily classified as nontestimonial, our supreme court has concluded that "a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the . . . targeted accusation requirement" adopted by the plurality of the Supreme Court in *Williams v. Illinois*, 567 U.S. 50 (2012), or the "formality criterion" espoused by Justice Thomas in his concurring opinion in *Williams*, stating that "[o]therwise put, . . . an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)).

Here, Ms. Clemons' prior statements are undoubtedly testimonial. *See Crawford*, 541 U.S. at 68 ("Whatever else the term [testimonial] covers, it applies at a minimum to prior testimony . . . at a former trial . . . ."). Ms. Clemons, however, was not an unavailable witness; she testified at the defendant's trial and was subject to cross-examination. Consequently, the admission of her prior testimony did not violate the defendant's right to confrontation. *See Ackerman*, 397 S.W.3d at 640 ("*Crawford* has no application in this case because the declarant . . . was present, testified at trial, and was subject to cross-examination. *Crawford* and its progeny are limited to those situations when the State offers into . . . evidence the out-of-court statement of a non-testifying

-22-

declarant." (citing *Crawford*, 541 U.S. at 59)).  Moreover, Ms. Clemons' "nearly complete lack of memory" at the defendant's trial did not render her an unavailable witness for the purposes of the Confrontation Clause.  *See id.* at 641 ("Although a witness'[s] lack of memory may render her 'unavailable' for purposes of our rules of evidence, a lack of memory does not render a witness unavailable for purposes of the confrontation clause." (citations omitted)).  Consequently, the admission of Ms. Clemons' prior testimony did not violate the defendant's right to confrontation.

## II.  Confrontation of Remote Witness

At the beginning of the trial, the State presented a letter from The University of Tennessee Medical Center, certifying that Ms. Clemons was seen as a patient at the emergency room on October 9, 2020, and had been instructed to quarantine for 14 days, until October 22, 2020, "[d]ue to a [sic] positive covid-19 results."  The State informed the court that Ms. Clemons was a necessary witness.  The State also told the court that because Ms. Clemons indicated that she was reluctant to come to court to testify, the State arranged to have her arrested for an outstanding warrant to ensure her availability, at which time the State became aware of and received the letter regarding her positive COVID-19 test results.  The State asked the trial court to permit Ms. Clemons to testify remotely because of her COVID-19 diagnosis.  The defendant's counsel responded, "I would want to see . . . what remote facility she would have to make sure that we could see it and then all the jury could see it."  The trial court explained that Ms. Clemons would testify from the jail and said, "I'm pretty confident in the jail's video system being clear to understand and see."  The court noted, "we'll get the video set up before we have the jury see that and make sure it's working for all of us."  The defendant did not object on Confrontation Clause grounds or otherwise.

When Ms. Clemons began her virtual testimony, the trial court confirmed that she could hear the proceedings.  At the start of her testimony, the transcript indicates that several of Ms. Clemons' responses were unintelligible due to "audio difficulties."  The court interrupted the direct examination and told Ms. Clemons that she was "breaking up on me a little bit" and asked her to "get a little bit closer to the microphone" and to speak "a little louder."  During a jury-out hearing, the transcript again indicates technical difficulties in getting an audio recording to play where Ms. Clemons could hear it, but after several attempts, Ms. Clemons indicated that she heard the audio.  The transcript indicates "[a]udio difficulties" in three more of Ms. Clemons' responses during the jury-out hearing.  At the beginning of cross-examination before the jury, Ms. Clemons responded to defendant's counsel by saying, "I can't hardly hear you," and "I'm still not understanding you."  During the remainder of Ms. Clemons' testimony, she responded to questions without indicating further difficulty hearing.  Despite the technical difficulties, the defendant did not object to Ms. Clemons' remote testimony at any point.

Because the defendant failed to object at trial to Ms. Clemons' testifying remotely, he has waived the issue, *see* Tenn. R. App. P. 36(a); *State v. Morton*, No. E2019-01755-CCA-R3-CD, 2022 WL 2301439, at *21 (Tenn. Crim. App., Knoxville, June 27, 2022); *see also Melendez-Diaz v. Massachusetts*, 577 U.S. 305, 313 n. 3 (2009) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence . . . ."), and consequently, is limited to plain error review, *see State v. Vance*, 596 S.W.3d 229, 253-54 (Tenn. 2020) (defendant limited to plain error review when he raised confrontation issue for the first time in the motion for new trial); *see also* Tenn. R. Crim. P. 36(b). An error may be recognized as plain only when all five of the following factors has been established:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

Here, the defendant is not entitled to plain error relief because it is not evident that "a clear and unequivocal rule of law . . . ha[s] been breached." *See Smith*, 24 S.W.3d at 282. The United States Supreme Court has made clear that, in certain circumstances, "the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation," *Maryland v. Craig*, 497 U.S. 836 (1990), and this court has previously applied the standard set forth in *Craig* to the use of "two-way teleconferencing technology" and determined that it may be used in some circumstances without violating a defendant's right to confrontation, *State v. Seale*, No. M2019-01913-CCA-R9-CD, 2020 WL 4045227, at *8 (Tenn. Crim. App., Nashville, July 20, 2020).

*Conclusion*

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE